[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION (COMMITMENT PROCEEDINGS)
I. HISTORY
On February 24, 2000, the defendant was acquitted of the charges of Robbery 1st degree, C.G.S. § 53a-134; Larceny 1st degree C.G.S. § 53a-122; and Criminal Attempt to Commit Assault 1st degree C.G.S. § 53a-49, 53a-59, the court having determined that the acquittee-defendant lacked substantial capacity, as a result of mental disease or defect to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law pursuant to C.G.S. § 53a-13.
The court further found that the acquittee-defendant voluntarily ingested the prescription drugs Prozac and Xanax; that said prescription CT Page 7412 drugs were prescribed for the acquittee-defendant by his prescribing medical practitioner; and that said medications were taken in accordance with the directions of said prescription, also pursuant to C.G.S. §53a-13.
On February 24, 2000, the court ordered the acquittee Christopher Deangelo committed to the custody of the Commissioner of Mental Health for an examination to determine his mental condition pursuant to C.G.S. § 17a-582 (a)(b)(c)(d)(e). A hearing to determine the mental condition of the acquittee was scheduled for April 6, 2000 pursuant to C.G.S. § 17a-582 (b)(c)(d)(e).
On February 24, 2000, the court, pursuant to C.G.S. § 17a-582
and/or C.G.S. § 17a-593 and C.G.S. § 17a-601 (a)(b), made a finding that there are specific victims of the acts committed by the acquittee and that said victims desired notice of any hearings held by the court pursuant to C.G.S. § 17a-582 or 17a-593.
On April 6, 2000, the court was notified in writing by the Department of Mental Health and Addiction Services at the Whiting Forensic Division of the Connecticut Valley Hospital that an extension of time to complete the statutorily-mandated examination of the acquittee was being required. Having secured the agreement of the State's Attorney's office and counsel for the acquittee, the court ordered the hearing to determine the mental condition of the acquittee continued to May 1, 2000, and thereafter to June 1, 2000.
II. COMMITMENT PROCEDURES AND HEARING
Connecticut General Statutes § 17a-581 establishes a five-member psychiatric security review board (hereinafter referred to as "the board") and C.G.S. §§ 17a-582 through 17a-601 direct the court to adhere to the required procedures when a criminal defendant is found not guilty by reason of mental disease or defect.
At the statutorily mandated hearing, where the acquittee shall have the burden of proving by a preponderance of the evidence that he should be discharged, C.G.S. 17a-582 (f), the court shall make a finding as to the mental condition of the acquittee and, considering that its primary concern is the protection of society, make one of the following orders:
 (a) If the court finds that the acquittee is a person who should be confined or conditionally released, the court shall order the acquittee committed to the jurisdiction of the psychiatric security review board and either confined in a hospital for mental CT Page 7413 illness . . . for custody, care and treatment pending a hearing before the board; provided that the court shall fix a maximum term of commitment not to exceed the maximum sentence that could have been imposed if the acquittee had been convicted; and if the court has reason to believe that the acquittee is a person who should be conditionally released, the court shall include in the order a recommendation to the board that the acquittee be considered for conditional release; or
 (b) If the court finds the acquittee is a person who should be discharged, the court shall order the acquittee discharged from custody.
In determining whether an insanity acquittee should be confined to a mental hospital because his release from custody would constitute a danger to himself or to others, the court may consider:
 (a) the acquittee's present mental state or condition;
 (b) evidence of recent violent behavior, or attempted or threatened dangerous conduct;
 (c) the violent act for which he had been brought to trial; and
 (d) the fact that his symptoms are controllable by anti-psychotic drugs, but if he were released and stopped taking any medications, he would revert back to an uncontrolled psychotic state.
The determination of dangerousness, as it is in the case of the issue of mental illness, constitutes a legal decision. Psychiatric predictions of future dangerousness, while of some value to the court, should not be unduly relied upon. The court's main concern must be the protection of society, and not necessarily the therapeutic goals. The determination of dangerousness by the trial court reflects a societal rather than a medical judgment, and requires the court to balance the security interests of society against the rights and needs of the acquittee. Statev. Putnoki, 200 Conn. 208, 219-221 (1986).
On committing an acquittee to the jurisdiction of the board, the court shall advise the acquittee of his right to a hearing before the board in accordance with C.G.S. § 17a-583 and C.G.S. § 17a-582 (i). Except CT Page 7414 as provided in C.G.S. § 17a-593 (c), the acquittee shall be immediately discharged at the expiration of the maximum term of commitment. C.G.S. § 17a-582 (h).
An order of the court committing or discharging an acquittee may be appealed by the acquittee or the State's Attorney to the Appellate Court, and the court shall so notify the acquittee. C.G.S. § 17a-582
(g).
The board shall conduct a hearing to review the status of the acquittee within ninety (90) days of an order committing the acquittee to the jurisdiction of the board.
At any hearing before the court, documents and reports considered by the court shall be available to the acquittee, his counsel and the State's Attorney. Additionally, if the court determines that the acquittee should be confined, the court must make a further determination of whether the acquittee is so violent as to require confinement under conditions of maximum security.
The court shall, on committing an acquittee to the jurisdiction of the board, identify the victim to the board, which thereafter shall make "a reasonable effort" to notify the victim of any board hearings or orders, or of any escape of the acquittee. C.G.S. § 17a-601 (b). The victim may appear at any court or board hearing concerning the acquittee, to make a statement. C.G.S. § 17a-601b.
Pursuant to C.G.S. § 17a-582 (f), at the hearing before the court, the acquittee shall have the burden of proof by a preponderance of the evidence that he is a person who should be discharged.
The court, in considering its decision, commenced the hearing on June 1, 2000. Thereafter, the hearing was continued to June 7, 2000 and June 8, 2000. On June 16, 2000, the evidentiary testimony concluded, and the court continued the hearing until June 19, 2000 for the rendering of its decision.
III. FINDINGS
In considering its decision, the court reviewed the documentary exhibits and reports, as well as the testimony of Dr. Peter Breggin, Dr. Cynthia Epperson, Laurie DeAngelo and Christopher DeAngelo, the acquittee, all of whom testified in the acquittee's behalf. The court has also reviewed the testimony of Dr. Paul T. Amble, a forensic psychiatrist, who consulted with the State of Connecticut, Connecticut Valley Hospital, Whiting Forensic Division in preparing the evaluation of CT Page 7415 the acquittee, which was mandated by Connecticut General Statutes § 17-582.
The testimony of the psychiatrists in court and the reports entered as exhibits, including the report of Dr. Carl Salzman, dated May 9, 2000 and the Whiting Forensic report, present the court with varying opinions as to the future treatment options for the acquittee. While each psychiatrist confirms that the acquittee suffers from obsessive compulsive disorder (hereinafter referred to as OCD), they differ in their conclusions as to treatment options.
Dr. Breggin's conclusion is that the acquittee is not a danger to himself or others, whether or not he remains on medications, such as Luvox. Dr. Breggin further advises the court that the acquittee should not be confined to a maximum security ward and that the acquittee should be "unconditionally released." Dr. Breggin argues that "at most, the court should require the acquittee to be in therapy with a doctor of his own choice for a one-to-two year period."
Dr. Breggin attributes the acquittee's bizarre behavior on December 2, 1997, which resulted in the armed robbery of the First Union Bank in Derby, Connecticut, to drug intoxication with Xanax and Prozac, compounded by increased alcohol use while taking these drugs. Dr. Breggin concludes that the acquittee is now aware of the danger of drug induced mania, and with the help of his family and friends, can be careful to avoid a second episode. Dr. Breggin's finding is that the acquittee's only mental disorder is OCD, a problem not associated with danger to himself or others. While OCD can lead to increased anxiety, agitation and difficulty in functioning, it has no link to violence. Dr. Breggin states that persons with OCD are less likely to engage in criminal behavior, as they are more controlled persons and less violent.
Dr. Breggin, however, concedes that while psychiatrists are called upon to assess the future dangerousness of persons, they are quite poor at doing it. Dr. Breggin, who is not a board certified psychiatrist, also concedes that he does not believe in the involuntary hospitalization of persons and argues that the Criminal Justice System should not do it under any circumstances. Dr. Breggin has not been an attending physician in a psychiatric hospital since the 1970's, and has let his hospital privileges lapse. In explaining the lapse of his hospital privileges, Dr. Breggin informed the court that he didn't need them anymore, since he does not hospitalize any patients. Dr. Breggin has not been involved in the involuntary hospitalization of a patient in at least 35 years, and the last time he attended a patient in a hospital was in the late 1960's. CT Page 7416
Dr. Breggin expresses little concern that the acquittee will be a future danger to himself or others, as long as he refrains from usage of Prozac and Xanax.
The court has also reviewed the report of Dr. Carl Salzman, M.D., Professor of Psychiatry at the Harvard Medical School. The report is dated May 9, 2000.
Dr. Salzman reviewed the Whiting Forensic report concerning the acquittee, as did Dr. Breggin. Dr. Salzman concludes that the acquittee is suffering from two psychiatric illnesses, viz. obsessive compulsive disorder and a tendency to, at times, "become manic when treated with antidepressant medication. His behavior is worsened by drinking alcohol."
Dr. Salzman, while stating that "it is absolutely essential that the acquittee continue to receive treatment," the treatment could be conducted on an out-patient basis. "It is standard psychiatric practice to treat bipolar patients and even bipolar patients with serious OCD as outpatients." Dr. Salzman, however, acknowledges that excessive or binge drinking does increase the risk of treatment non-compliance, but that it does not, in most cases, require in-patient treatment.
Dr. Salzman recommends the following plan for out-patient treatment:
 1. Continue antidepressant medications for the acquittee's OCD along with psychotherapy and behavioral therapy;
 2. Continue with mood stabilizing drugs, either lithium carbonate or an anti-convulsant whose blood levels can be measured such as valproate or carbamazepine;
 3. Measure the blood levels of these drugs on a weekly basis to ensure that the acquittee is taking his medication;
 4. Acquittee should enroll in an Alcoholics Anonymous program with a sponsor and regular attendance;
 5. Should the acquittee stop taking his medications or fails to attend AA meetings and continue to drink, he should then be re-hospitalized.
Also testifying in behalf of the acquittee during the hearing proceedings was Dr. Cynthia Epperson. Dr. Epperson is an Assistant Professor of Psychiatry at the Yale School of Medicine and was the Director of the Obsessive Compulsive Disorder Clinic at Yale from 1997 CT Page 7417 through 1999. Prior to her testimony in court, Dr. Epperson has never spoken to, or met the acquittee. She did, however, conduct a review of some of the reports and exhibits furnished to her by the acquittee's legal counsel.
Dr. Epperson testified that persons suffering from OCD are not violent or dangerous to themselves or others. The majority of her patients have had no manic episodes. When questioned by the attorney for the State of Connecticut if a diagnosis of a bipolar disorder would change her opinion, Dr. Epperson responded that it would not change her opinion. Dr. Epperson was confident that now that the acquittee and his family knew of the warning signs for a possible manic episode in the future, they could stop it before the manic episode occurred.
Dr. Epperson testified that a patient such as the acquittee must be "watched like a hawk" during any course of outpatient treatment. A treating physician must keep close contact and close monitoring with the patient, ideally on a weekly basis.
Dr. Epperson recommended a course of outpatient treatment to include regular psychiatric visits with a treating physician; behavioral therapy; use of mood stabilizing medications and the use of the drug Luvox. Dr. Epperson stated that she would be very concerned if the patient became uncooperative in complying with this course of treatment on a faithful basis. She stated that if the patient was non-compliant or uncooperative, she would counsel family members to recommend hospitalization.
The acquittee, himself, and his wife also testified before the court. The acquittee's wife testified that she has known the acquittee for approximately eight years, and now has been married to him for three and one-half years. She testified that treatment had been sought from Dr. Rossi for the acquittee's OCD because of increasing anxiety in the acquittee, which was resulting in serious distractions from his work.
Mrs. DeAngelo attended several of her husband's appointments with Dr. Rossi and never heard Dr. Rossi warn her husband about possible side effects of Prozac or Xanax. Mrs. DeAngelo testified that Dr. Rossi told the acquittee in September 1997, that the acquittee could ingest alcohol beverages, as long as he kept his drinking in moderation. This conflicts with notations in Dr. Rossi's treatment notes, which warn against use of alcoholic beverages while on these medications.
Mrs. DeAngelo reaffirmed her love for her husband and indicates a desire for his release to return home. She also stated that she did not notice any change in his behavior at the time the acquittee was involved CT Page 7418 in four armed robberies in Wallingford and Derby.
The acquittee's testimony also alleges that Dr. Rossi told the acquittee that he could drink socially while on Prozac and Xanax, but that the acquittee should be careful. The acquittee also stated that while on Prozac and Xanax, he was "feeling no pain," and was feeling more reckless and careless.
Despite accurate and detailed statements to the police regarding his involvement in four armed robberies, the acquittee now claims he remembers very little about those events and his involvement in them. It is all "foggy" to him at this time.
The acquittee admits that he has consumed alcoholic beverages since his release on bond, but states that he has limited his consumption to just occasional beers. He states that since Dr. Rossi prescribed Luvox for him approximately one year ago, he has only consumed one or two beers.
Dr. Paul T. Amble testified in behalf of the State of Connecticut and has recommended that the acquittee be committed to the jurisdiction of the Psychiatric Review Board for a period of time to be set by the court, and that the acquittee should remain inpatient at the Whiting Forensic Division at the Connecticut Valley Hospital.
Dr. Amble is an Assistant Clinical Professor of Psychiatry at Yale University. He is a Board Certified Forensic Psychiatrist. He is a consulting Forensic Psychiatrist for the Department of Mental Health and Addition Services, Division of Forensic Services, State of Connecticut. He has testified in both Federal and State courts in excess of 100 times.
Dr. Amble testified that studies have been conducted that reveal that 11% of persons suffering from OCD will commit acts of violence compared to 2% to 2 1/2% of the population that does not suffer from OCD. Persons with OCD are approximately five times more likely to commit acts of violence than the general population which does not suffer from OCD.
Dr. Amble testified that it is almost impossible to state the exact cause for a manic episode. Causes can include reactions to antidepressant medications, stress, alcohol usage, sleep deprivation and illicit drug usage. In addition, a first degree relative with a bipolar disorder can pass the genetics of the bipolar disorder to a child, increasing the susceptibility of manic episodes. Additionally, the intervals between manic episodes cannot be predicted. There can be months and even years between episodes. CT Page 7419
Dr. Amble emphasized that OCD causes stress and will continue to do so. Stress can be a dangerous "trigger" for a risk of another manic episode by the acquittee. Dr. Amble concedes that the violence involved in the acquittee's first manic episode was not typical. He acknowledges that the acquittee is not violent at this immediate time and has not been violent since his arrest. However, Dr. Amble contends that while the acquittee is currently maintaining himself, he could decompensate quickly and become dangerous. Because the time between manic episodes varies, treating physicians are lulled into thinking a patient is stabilized.
Dr. Amble states that the acquittee needs supervision; especially if he has a genetic predisposition to bipolar disorder. He concludes to a reasonable degree of medical certainty that if the acquittee suffers another manic episode, he could be dangerous to himself and dangerous to others. He cites factors in support of this dangerousness. Among these factors are the usage of firearms in the robberies and his attempt to flee the First Union Bank in Derby, which resulted in a policeman almost being run down by the acquittee's auto. Additionally, he caused danger to himself, as the police were required to fire their weapons at the acquittee and his vehicle.
Lastly, the court has reviewed the Evaluation of the acquittee, conducted at the Whiting Forensic Division of the Connecticut Valley Hospital. This evaluation was ordered by the court on February 24, 2000, in compliance with C.G.S. § 17a-582. The report has been submitted by Carol Caplan, MS, RN, CS, Director, Diagnostic Unit, Joseph More, M.D., Attending Psychiatrist and James J. Cassidy, J.D., PhD., Director, Whiting Forensic Division. The Whiting report takes into account the acquittee's academic records, employment records, medical records, Department of Corrections Records from December 3, 1997 to March 5, 1998, police reports, statements of the acquittee and witness statements. Additional sources of information include notes of Beverly Greenspan, M.D., Ph.D.; office records of William K. Stableford, Ph.D., dated November 12, 1998 to March 2, 1999; reports from Robert C. Bransfield, dated August 24, 1998; evaluation of Dr. Peter Breggin, dated December 21, 1998; evaluation from Dr. Carl Salzman, dated February 12, 1999; and a psychopharmacology consultation by Cynthia D. Conrad, M.D., Ph.D., dated December 30, 1998.
The evaluation team consisted of Dr. Joseph More (psychiatrist); Tim Schumacher, Ph.D. (clinical psychologist); Anna Meyers (psychology intern); Susan McKinley, LCSW (psychiatric social worker); Carol Caplan, MS, RN, CS (nurse clinical specialist); Heath Bloam, RT2 (music therapist); Marie Rodrigue, RN (nursing); Bob Gendron, FTS (nursing); Kuruba Sathapa, M.D. (internist). Dr. Paul T. Amble (consulting forensic psychiatrist) served as a consultant to the evaluation team. CT Page 7420
The report notes that in 1997 the acquittee was employed by the AAA Motor Club as an insurance agent. The acquittee's job performance overall was strong. Prior to November 1997, the acquittee's job productivity began to decline and his absenteeism from work increased. On November 26, 1997, he resigned his employment with the motor club.
The acquittee initially sought psychiatric help on July 8, 1997 with Lawrence Rossi, a psychiatrist in private practice. The acquittee's presenting problem was "worry, dwelling, repeating thoughts and words." the acquittee reported he would drink a few beers on the weekends and noticed that his worries decreased, and he felt less anxious when drinking. The acquittee also reported that he had moved into a new home and he had a big mortgage. Dr. Rossi identified this as a significant psychosocial stressor, which the acquittee in his hearing testimony denied. The acquittee also expressed concern that his wife would lose patience with him.
Dr. Rossi diagnosed the acquittee with Obsessive Compulsive Disorder (OCD) and started him on a course of treatment which included Prozac. Dr. Rossi's notes indicate that he spoke with the acquittee regarding the side effects of the medication and told him to "avoid alcohol".
The acquittee continued with Dr. Rossi through July 1997. The acquittee discontinued the Prozac by not refilling his prescription. The patient-acquittee reported no improvement in his condition. The Prozac was again started on July 29, 1997 and a prescription for Xanax was added.
This course of treatment continued into September 1997 with the acquittee noting some improvement. On October 15, 1997, the acquittee's wife accompanied him to Dr. Rossi's office where she confirmed that the purchase of the new home and their new marriage were stressors in the acquittee's life.
Due to a cancelled appointment, the acquittee was not seen by Dr. Rossi again until November 22, 1997. He reported improvement in his condition to Dr. Rossi and also admitted that he was not engaging in the educational activities suggested by Dr. Rossi as part of his treatment for OCD.
On November 26, 1997, four days following his November 22, 1997 appointment with Dr. Rossi, the acquittee admittedly robbed the Dime Savings Bank in Wallingford, Connecticut.
On November 30, 1997, the acquittee admittedly robbed Super K-Mart and CT Page 7421 Scott Oil in Wallingford, Connecticut.
On December 2, 1997, the acquittee was arrested for the armed robbery of the First Union Bank in Derby, Connecticut. At Police Headquarters the acquittee stated that as a result of recent money problems, he got the idea to rob a bank.
Both the acquittee's mother and wife visited him at the police department and expressed concern that the acquittee "didn't seem to understand what had gone on." His wife also expressed concern that the acquittee had the odor of alcohol on his breath and acted in a nonchalant manner after being arrested.
On December 4, 1997, the acquittee was examined by the Department of Corrections and the acquittee was found to be "mildly depressed with anxious affect." A thought disorder with excessive worrying was reported. The acquittee was diagnosed with OCD and prescribed Prozac. Anafranil, an additional medication was added on December 8, 1997. Progress notes indicate that the acquittee was seen again by a psychiatrist on January 14, 1998 because the acquittee had stopped taking his medications.
On February 24, 1998, the psychiatrist at the Corrections Department stated that the acquittee said "Prozac and Xanax do not help his OCD but that he must continue to take them `because it will be his defense'."
Following the acquittee's release from jail on bail, he saw multiple mental health providers for treatment and to prepare his legal defense. He also returned to treatment with Dr. Rossi. However, in the twenty-three months between his release from jail and his commitment to Whiting Forensic Division for his evaluation he missed twenty-one of his forty scheduled appointments with Dr. Rossi. In mid-March 1998, the acquittee also reported to Dr. Rossi that he had stopped taking his medications.
The acquittee next saw Dr. Rossi on April 22, 1998, after cancelling an appointment, and reported that once again, he had stopped taking his Prozac about one week before. The acquittee then canceled three subsequent appointments. On June 10, 1998, the acquittee met again with Dr. Rossi and informed him that he had stopped taking the Xanax medication in early May 1998. The acquittee continued to see Dr. Rossi on an irregular basis, while seeking evaluations and consultations with Robert C. Bransfield, a New Jersey psychiatrist, Dr. Peter Breggin, Dr. Beverly Greenspan and Dr. Cynthia Conrad. Dr. Bransfield recommended treatment with a Prozac-type medication called Luvox. The acquittee continued to report to Dr. Rossi that his OCD symptoms were worsening, CT Page 7422 and Dr. Rossi began prescribing Luvox to the acquittee on September 2, 1998.
On September 15, 1998, the acquittee reported to Dr. Rossi that his symptoms were again worsening and that he was anxious and depressed, a fact that was confirmed to Dr. Rossi by the acquittee's wife. However, both the acquittee and his wife denied any symptoms of bizarre behavior or manic activity by the acquittee.
On October 7, 1998, the acquittee saw Dr. Rossi accompanied by his mother-in-law. Both the mother-in-law and the acquittee's wife thought that the acquittee was becoming "hyper" on Luvox, and they described that the acquittee had become restless, repeated words and that his speech was increased.
On October 20, 1998, the acquittee informed Dr. Greenspan that he had resumed a pattern of light social drinking. On November 12, 1998, he reported to Dr. Stableford, that his worrying had increased to the point that it was significantly interfering with his ability to work. On December 15, 1998, Dr. Stableford notes that the acquittee was reporting severe insomnia and a total interference with his ability to work.
On January 13, 1999, the acquittee under Dr. Rossi's care, reluctantly agreed to resume taking medication, with a clear warning to "avoid all alcohol." On February 1, 1999, the acquittee reported that he got "locked into obsessing for four hours and ended up crying and hitting himself." He stated, "I can't work. I am trying. I'm frightened."
The acquittee continued to see Dr. Rossi on two occasions in March, 1999. He did not keep any of his appointments in April, 1999. He returned to Dr. Rossi once in May, 1999 and missed all three of his appointments with Dr. Rossi in June, 1999. He saw Dr. Rossi once in July, 1999 and then missed his next three appointments. He visited Dr. Rossi once in September, 1999 and again on December 2, 1999, when he reported improvement. He did not keep his appointment with Dr. Rossi in January, 2000 although on January 13, 2000, the acquittee did call to have his Luvox prescription refilled.
According to Dr. Rossi, his last contact with the acquittee, prior to the admission to the Whiting Forensic Division, was this call on January 13, 2000.
While the acquittee's evaluation period at the Whiting Forensic Division since his admission on February 24, 2000 has been marked by some violations of rules and episodes of poor judgment, his stay has been unremarkable. He continues to exhibit symptoms of Obsessive Compulsive CT Page 7423 Disorder. While exhibiting irritable behavior at times, the acquittee has not resorted to violence or uncontrollable anger during his evaluation at the Whiting Forensic Unit.
The acquittee has given inconsistent and conflicting information regarding his pattern of alcohol consumption. The acquittee began alcohol consumption during his early twenties on a social basis. He reports drinking more heavily after starting Prozac. He also recalls drinking before the robberies of K-Mart, Scott Oil and the First Union Bank. He reports that drinking calmed him, and that "it drowned out some of my worries." He also reports drinking while on his medications.
When he was first released from jail in March, 1998, he abstained from alcohol. However, he then began light drinking of beer only, with the agreement of his wife. The acquittee and his wife also agreed to withhold the information regarding his alcohol consumption from Dr. Rossi for "no good reason I can think of," according to the acquittee.
The acquittee's testing results show a defensive response style of tending to under-report his psychological symptoms. He lacks insight into himself and his behavior. He experiences pervasive anxiety that interferes with nearly all of his psychological functioning. His high levels of anxiety substantially interfere with his social, emotional and cognitive functioning. He is vulnerable to errors of oversight. He appears prone to occasional dramatic outbursts.
The acquittee's obsessive thinking interferes with his understanding of his behavior at the time of the crimes. He blames the police for using excessive force. The report states that "This need to present himself as not responsible for his actions impairs his ability to understand the danger that he placed himself and others in."
The acquittee concedes that he would be willing to go along with an outpatient commitment, with conditions, but that he doesn't think it is necessary.
It is the conclusion of the evaluation of the Whiting Forensic Division that the acquittee suffers from a serious psychiatric illness which has interfered with his ability to function successfully on a daily basis.
The treatment with Prozac and Xanax combined with alcohol resulted in a manic-like episode culminating in the commission of crimes. Further, while in the community, on bond and off of medication, the acquittee suffered a significant episode of depression. The acquittee's insight into his illness and ability to utilize therapeutic interventions are significantly impaired at the present time. "This factor combined with a CT Page 7424 history of missed appointments, a tendency to blame external factors for his actions and a resumption of alcohol use while on bond, increase the risk that he may be non-compliant with treatment."
The Whiting Forensic Division evaluates the acquittee as a danger to the public if released, and it is recommended that he be committed on an inpatient basis to the jurisdiction of the Psychiatric Security Review Board. It is also recommended that he be returned for placement on the Diagnostic Unit in the maximum security Whiting Unit of the Whiting Forensic Division of the Connecticut Valley Hospital for continuing treatment.
The court has additionally weighed the in-court statement of a victim of the December 2, 1997 occurrence at the First Union Bank in Derby, Connecticut. The victim, a bank employee, informed the court of the frightening events of December 2, 1997, and the impact it has had on the victim to date.
IV. CONCLUSION
As noted, the court has been presented with various treatment options for the acquittee by psychiatrists who have testified in court and/or evaluated the acquittee since his date of arrest. While Dr. Breggin recommends against involuntary commitment or any court-ordered therapy or sanctions, the remainder of medical evaluators do agree that treatment is necessary
Dr. Salzman and Dr. Epperson argue that closely-monitored treatment on an outpatient basis is sufficient for the acquittee's psychiatric illnesses. However, both caution that non-compliance by the acquittee with their recommended treatment programs would cause them enough concern to recommend immediate hospitalization.
In the past several years, the acquittee has shown that he has missed numerous appointments with Dr. Rossi. Against Dr. Rossi's advice and with the reluctant agreement of his wife, he has at times resumed his use of alcohol. During his treatment with Dr. Rossi and while in the custody of the Department of Corrections, the acquittee has stopped taking his medications, against the advice of his medical treaters. When he has stopped taking the medication, on more than one occasion his symptoms related to his OCD worsened.
The court is also concerned with the medical studies by Dr. Amble which appear to indicate that a person suffering from Obsessive Compulsive Disorder is five times more likely to commit acts of violence than the general population that does not suffer from this illness. CT Page 7425
The court agrees with the evaluation of the Whiting Forensic Division and Dr. Amble that the acquittee's history of missed appointments; his tendency to blame external factors for his actions and his resumption of alcohol use increase the risk that he may be non-compliant with the treatments which Dr. Salzman and Dr. Epperson urge can be done on an outpatient basis.
The court's primary concern must be the protection of society. As stated earlier in this decision, the determination of dangerousness constitutes a legal decision. Psychiatric predictions of future dangerousness, while of some value, must not be unduly relied upon. The court's main concern must be the protection of society, and not necessarily therapeutic goals. The sheer weight and divergence of the psychiatric testimony and evaluations shows the degree of disagreement among the psychiatric community who have evaluated the acquittee.
The court takes issue with Dr. Breggin's position that no person should ever be involuntarily hospitalized and certainly not by the criminal justice system. This unbending position by Dr. Breggin tends to undermine his objectivity in the eyes of the court when weighing his opinion.
The Court in balancing the security interests of society against the rights and needs of the acquittee has weighed the acquittee's present mental state. The court has considered the violent act for which he had been brought to trial, and the fact that his symptoms can be lessened by appropriate medication. The court also has considered that if he stopped medication and became non-compliant with his treatment, he may suffer further manic episodes of violence.
Therefore, it is the order of this court that Christopher DeAngelo, the acquittee is hereby committed to the jurisdiction of the psychiatric security review board and he shall be confined at the Whiting Unit, under maximum security, at the Whiting Forensic Division of the Connecticut Valley Hospital for a maximum period of commitment, not to exceed ten (10) years. The court finds that the acquittee presently constitutes a danger to himself and others.
The court further orders that the victim of this crime, who is identifiable shall hereafter be notified of any further hearings before the board of the court or of any escape from custody by the acquittee. The victim shall have a right to appear at any court or board hearing concerning the acquittee, and shall be given the opportunity to make a statement. These orders are in compliance with Connecticut General Statutes § 17a-582 through Connecticut General Statutes § 17a-601. CT Page 7426
The court hereby advises the acquittee of his right to a hearing before the Psychiatric Security Review Board in compliance with C.G.S. §17a-583 within 90 days of today's date.
The acquittee may appeal this order to the Appellate Court and in accordance with Connecticut General Statutes § 17a-582 (g), the acquittee is so notified of his right to an appeal.
THE COURT
 By ____________________ ARNOLD, J.